**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**ROBERT E RACK, as Special Administrator**                    **PLAINTIFF**
**for the Estate of Lois M. Rack, Deceased,**
**and on behalf of the wrongful death beneficiaries of**
**Lois M. Rack;**

**v.**                    **Case No.  4:20-CV-00135 – BRW-JTK**

**JOSEPH SCHWARTZ, ROSIE SCHWARTZ,**
**JOHN DOES 1-5, Unknown Defendants**                    **DEFENDANTS**

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

### INSTRUCTIONS

The following recommended disposition has been sent to United States District Court Judge Billy Roy Wilson. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the United States District Judge,

you must, at the same time that you file your written objections, include a "Statement of Necessity" that sets forth the following:

1.   Why the record made before the Magistrate Judge is inadequate.

2.   Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at the hearing before the Magistrate Judge.

3.   An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
>
> Eastern District of Arkansas
>
> 600 West Capitol Avenue, Suite A 149
>
> Little Rock, AR 72201-3325

## I.   <u>Introduction</u>

Lois Marie Rack is a daughter and a baby sister. She had a soft face with expressive eyes and a smile that lit up the room. In a family photo presented at trial, she stands between two of her brothers. She and her mother are wearing matching yellow dresses. Collectively they are the Rack Family, known for singing gospel songs. Everyone agrees that Lois had a beautiful voice. Once she traveled to New York City to participate in a singing competition. Although she didn't win, she made it far and her family was proud.

Lois loved to spend time with her family. A typical night with Lois might include eating good food and playing dominoes or card games or, maybe, Lois was braiding someone's hair. One certainty at the family gathering is the night would be filled with laughter. Her family remembers that Lois loved to make people laugh. In photos taken the week she moved into Hillview, Lois and everyone else is smiling and making faces. You can see the happiness and joy that she brought everyone around her.

Unfortunately, corporate greed and conscious indifference by the Defendants combined to ensure that Lois never returned home. In little more than 9 weeks Lois had developed sacral/buttock ulcers so deep you could see the bones; her wound bandages were not adequately changed leading to gangrene infections in both of her legs which would have required double amputation; her tracheostomy port became so infected that a foul odor emanated from her mouth. Lois died of sepsis and acute renal failure on February 12, 2018.

This case is before the Court following the entry of a Clerk's Default as to Defendants Joseph Schwartz and Rosie Schwartz (Doc. No. 39), the subsequent referral to this Court for trial and disposition. (Doc. No. 44), and the Court's entry of Default Judgment *nunc pro tunc* July 30, 2021. (Doc. No. 68). A bench trial was held on October 19, 2021, for the exclusive purpose of determining damages. At the conclusion of the trial the Court ordered Plaintiff to submit a brief articulating specific requests for damages supported by authority. After carefully considering Plaintiff's request for damages, as well as all evidence presented at trial, the Court makes the following recommended findings of fact and disposition:

## II.   **Findings of Fact**

Lois Marie Rack was admitted into Defendants' nursing home, Hillview Post-Acute and Rehabilitation Center ("Facility") on November 22, 2017 in stable condition. Ms. Rack was 52 years old at the time of her admission. She entered the Facility anticipating a short stint of rehabilitation with the expectation of going home to care for her Mother and be with her family. Ms. Rack had four siblings, Robert Rack, James Wesson, Roberta McGregor and Brinda Tillman ("Family"). Unfortunately, a little over two months after entering the Facility, Ms. Rack was taking her last breath. She passed away on February 12, 2018. The Rack family lost a daughter, a baby sister and a singer from the "Rack Singers" – a traveling gospel singing group.

Although default has been granted and liability is not at issue, there were numerous deficiencies in the standard of care that caused multiple injuries to Ms. Rack including her untimely death. The basic facts will be discussed briefly herein, but these facts are more specifically laid out in the opinion letter of Plaintiffs medical expert, Dr. Richard Dupee, MD, MACP, AGSF, FRSM, and in his testimony from the damages trial on October 19, 2021.[1] According to Dr. Dupee in summary, while a resident of the Facility, Ms. Rack suffered multiple injuries including multiple stage II or worse sacral/buttock ulcers, gangrene infections in both her legs, infection around the tracheostomy surgical site, and death due to sepsis and acute renal failure.[2]

Dr. Dupee opined at the October 19, 2021 damages trial, that Ms. Rack's injuries took time to develop and were excruciatingly painful during her residency leading up to her last breath.[3] Ms.

---

[1] *See* **Exhibit 27** – Report of Dr. Dupee, April 20, 2021.
[2] *Id.*; *see also* Exhibit 42 – Death Certificate, Feb. 12, 2018 (listing the immediate cause of death as sepsis).
[3] *See* **Exhibit 27** – Report of Dr. Dupee, April 20, 2021; the Transcript from the Oct. 19, 2021 Damages Trial in this case is still pending; *see also* **Exhibit 1** – medical record from Hillview Post Acute and Rehabilitation at Bates No.

Rack was not timely turned and repositioned, her wound dressings were not adequately changed, and the limited documentation of her injuries was shocking.[4] Further, the care, or lack thereof, that Ms. Rack received at the Facility was incredibly egregious, horrendously neglectful, pitiful and sad.[5] Moreover, the owners, management, staff and employees of the Facility recklessly failed to comply with their duties to Ms. Rack.[6]

At trial, Dr. Dupee, who has substantial experience in geriatric medicine including working as a nursing home staff physician, concluded that if Ms. Rack had received the care outlined in her care plan she should have only spent three weeks at the Facility before being released to her home. Dr. Dupee also observed, and the Family confirmed, that at the end of Ms. Rack's life, the choice was either to amputate both of her legs or place her on comfort measures.[7] Dr. Dupee stated during the October 19, 2021 trial that Ms. Rack's chance of surviving an amputation surgery were slim to none. Even the Family testified that they were told Ms. Rack had a low chance of surviving the

---

1-0184, showing Ms. Rack was in pain on Dec. 20, 2017; Bates Nos. 1-0418-1-0421 Weekly Wound Evaluation for lower left leg signed on January 26, 2018 showing Ms. Rack's "wound bed" caused her a 10 on the pain scale; Bates Nos. 1-0422-1-0421 Weekly Wound Evaluation for lower right leg signed on January 26, 2018 showing Ms. Rack's "wound bed" caused her a 10 on the pain scale; **Exhibit 2**– medical record from Baptist Health at Bates No. 2-0026, pain noted as a 5 on Jan. 30, 2018; Bates No. 2-0042, pain on Jan. 30, 2018 noted as moderate, constant and worsening; Bates No. 2-0149, pain on Feb. 2, 2018 noted as a 9, anxiety noted as a 9, nausea/vomiting noted as a 9, dyspnea noted as a 9; Bates Nos. 2-0652-3, 2-0665-66, February 7, 2018 wounds noted as "painful"; Bates Nos. 2-0572, 2-0574, 2-0586, and 2-0588, February 8, 2018 wounds noted as "painful"; Bates No. 2-0142, February 1, 2018 note saying "very foul odor from her wounds."; **Exhibit 5** – medical records from Hospice on February 11, 2018 at Bates Nos. 5-00038 and 5-0050, showing Ms. Rack was in pain; **Exhibit 6** – Medical record from Unity Health – White County Medical Center at Bates No. 6-0018, leg pain noted on February 3, 2018; **Exhibit 7** – Photos of Ms. Rack's injuries from Baptist Health following her residency at the Facility; **Exhibit 8** – Photos of Ms. Rack's injuries from Unity Health – White County Medical Center following her residency at the Facility.

[4] *See* **Exhibit 27** – Report of Dr. Dupee, April 20, 2021.

[5] *Id*. at Bates Nos. 27-0006, 27-0009-10.

[6] *Id*. at Bates No. 27-0012.

[7] **Exhibit 2**– medical record from Baptist Health at Bates No. 2-0146, Feb. 2, 2018 note stating, "may need bilateral AKA, wound debridement will leave large open wounds that may not heal well, other option is to consider palliative care."

amputation surgery by the hospital. The Family was faced with a decision between palliative care over amputating their sister's legs, with little chance that she would survive that surgery.

Roberta McGregor and Kathy Rack, Robert Rack's wife, were certified nursing assistants ("CNA") in nursing homes. Roberta McGregor, a CNA for 30 years, was appalled at the condition she saw Ms. Rack in when she visited.[8] Kathy Rack also went to visit Lois Rack. Kathy Rack noticed Lois Rack was dirty and that there were sores on her body. When Kathy Rack informed the nurse at the Facility, the nurse responded that she was unaware of the sores. James Wesson constantly complained to the staff about the poor care of Ms. Rack, but the complaints fell on deaf ears and nothing changed.

While Ms. Rack and her family suffered this unimaginable and preventable loss, Defendant Joseph Schwartz, owner of a national nursing home chain with 114 nursing homes across the country called "Skyline," ate lunch.[9] He bragged about being the largest nursing home chain operator in the country.[10]

While Mr. Schwartz ate lunch and bragged about his ownership, there was a survey done at the Facility on July 7, 2017 – roughly four months before Ms. Rack entered the Facility. The July survey found that the Facility failed to ensure pressure ulcer treatments were provided and failed to ensure proper documentation and assessment was completed for pressure sores.[11] Mr.

---

[8] **Exhibit 45** – Deposition of Roberta McGregor, Ms. Rack's sister, taken in this case, 9:5-11:23, Oct. 11, 2021.
[9] **Exhibit 39** – Deposition of Joseph Schwartz from *Ottimis Lloyd, et al. v. Skyline Health Care LLC, et al.*, No. 60CV-18-6386 (Pulaski Cty.), 12:16-13:9, Aug. 11, 2021.
[10] **Exhibit 38** - Deposition of Brandon Augustyniak from *Ottimis Lloyd, et al. v. Skyline Health Care LLC, et al.*, No. 60CV-18-6386 (Pulaski Cty.), 38:2-13, Aug. 9, 2021.
[11] *See generally* **Exhibit 15** – July 17, 2017 Survey at the Facility.

Schwartz and Ms. Schwartz failed to take appropriate, if any, steps to address the failures. The same issues identified in the survey occurred in this case.

Mr. Schwartz, through his Skyline entities, was in charge of everything at the Facility during Ms. Rack's residency.[12] Unfortunately for Ms. Rack, Skyline was "extremely disorganized" and the company's Chief Financial Officer, Brandon Augustyniak, went as far as to agree that he would never put his own mother in a Skyline nursing home.[13] Further, Mr. Augustyniak stated, "you would never get a straight answer out of Joe [Schwartz]."[14]

Instead of providing care, Defendants Joseph Schwartz and his wife Rosie Schwartz siphoned funds necessary for the treatment of the residents into their own pockets through the vehicle of companies they created.[15]

According to Mr. Schwartz, "we lost a lot of money, don't worry. Everybody worked for free."[16] However, Mr. Schwartz's statement is a half-truth. Plaintiff's allegations, which are admitted, support the assertion that Mr. Schwartz did not pay his vendors, utilities, landlords and nursing staff – thus, Defendants Joseph Schwartz and Rosie Schwartz admit that group of individuals, at times, worked for free.[17] Conversely, Plaintiff's allegations and evidence in the

---

[12] *See* Pl.'s Amend. Compl.; *see also* **Exhibit 14** – Management Agreement for multiple Arkansas Skyline Facilities including the Facility in this case, Bates Nos. 14-0023-44.

[13] **Exhibit 38** – Dep. Augustyniak, 28:19-21, 36:25-37:4.

[14] *Id*. at 22:21-23:1.

[15] *See generally* Pl.'s Amend. Compl.

[16] **Exhibit 44** - Deposition of Joseph Schwartz from *Burage, et al.* v. *Skyline Health Care LLC, et al*., No. 60CV-18-2025 (Pulaski Cty.), 150:1-3, Sep. 30, 2021; *see also Id*. at 153:1-21.

[17] Pl.'s Amend. Compl., at pgs. 5-10, ¶¶ 16-34.

record reveals that Mr. Schwartz and Ms. Schwartz made millions by siphoning funds from the Skyline nursing homes – including the home in this case.[18]

Below are examples of how much money Defendants Joseph Schwartz and Rosie Schwartz took out of the Facility in one year and the resulting financial straits at the Facility,

- Rosie Schwartz's entity, 8701 Riley Avenue Holdings, LLC, received $491,229 from the Facility.[19]
- Joseph Schwartz's management company, Skyline Management Group, made $409,858;[20]
- Joseph Schwartz's billing company, Skyline Central Billing and Hilltop Health Care, LLC, made $409,858;[21]
- Joseph Schwartz's Home Office, Skyline Management Group, reported a revenue of $2,855,635;[22]
- Joseph Schwartz's Home Office, Skyline Management Group, spent $225,316 on "travel and entertainment";[23]
- Not one dollar was spent paying off the loan from the lender;[24]
- The Facility reported having negative $128,460 in cash on hand and in the bank;[25] and
- In total, the "net income (loss)" for this Facility was negative $2,191,293.[26]

By the time Ms. Rack became a resident and throughout her residency, the Facility did not have the means nor financial resources to provide adequate care. These numbers show a snapshot of a reckless siphoning scheme for just one home out of the 114 nursing homes across the country, including one out of the twenty homes Mr. Schwartz and Ms. Schwartz owned in Arkansas.

---

[18] *Id*.; *see also* **Exhibit 28** – "A Nursing Home Chain Grows too Fast and Collapses, and Elderly and Disabled Residents Pay the Price."
[19] **Exhibit 35** – Cost report from the Facility at Bates No. 35-0018.
[20] **Exhibit 35** – Cost report from the Facility at Bates No. 35-0011.
[21] **Exhibit 35** – Cost report from the Facility at Bates No. 35-0018.
[22] **Exhibit 35** – Cost report from the Facility at Bates No. 35-0030.
[23] **Exhibit 35** – Cost report from the Facility at Bates No. 35-0031.
[24] **Exhibit 35** – Cost report from the Facility at Bates No. 35-0021.
[25] **Exhibit 35** – Cost report from the Facility at Bates No. 35-0023.
[26] **Exhibit 35** – Cost report from the Facility at Bates No. 35-0025.

When asked, Mr. Schwartz did not remember ever reading nursing home regulations and never visited the Facility or any other Arkansas facilities.[27] He claims to have relied upon "very good regionals" to make sure his facilities were safe, but doesn't recall ever speaking to any regional or nursing employees.[28] Such want of care left vulnerable adults like Ms. Rack to suffer gruesome, gangrenous and grotesque conditions.

In sum, 52-year-old Lois Marie Rack never stood a chance at the Facility because Defendants Joseph Schwartz and Rosie Schwartz never gave her a chance. Ms. Rack fell victim to Joseph Schwartz's and Rosie Schwartz's national scheme to siphon dollars out of nursing homes – away from the most frail and vulnerable members of society.

## III.   **Conclusions of Law**

Upon entry of a default, the sole question remaining is the amount of damages to which a plaintiff is entitled.[29] Throughout the entirety of this litigation, Defendants Joseph Schwartz and Rosie Schwartz never filed a responsive pleading to Plaintiff's original Complaint nor Amended Complaint. As such, a default was entered, and liability is established. The only question left for the Court to decide is damages.

---

[27] **Exhibit 44** – Dep. of Joseph Schwartz from *Burage, et al.* v. *Skyline Health Care LLC, et al.*, No. 60CV- 18-2025 (Pulaski Cty.), at 72:4-20.

[28] *Id.* at 72:18-73:4, 87:21-88:5.

[29] *Jones v. McGraw*, 374 Ark. 483, 487, 288 S.W.3d 623, 626 (2008); *see also Taylor v. City of Ballwin, Mo.*, 859 F.2d 1330, 1332 (8th Cir. 1988); *Marshall v. Baggett*, 616 F.3d 849, 852 (8th Cir. 2010); *Fraserside IP L.L.C. v. Faragalla*, No. C11–3032–MWB, 2012 WL 124391, at *2 (N.D.Iowa Jan. 17, 2012).

### A.  Damages Available to the Plaintiff & Assessment of those Damages

These claims were brought by Robert E. Rack as the Special Administrator for the Estate of Lois M. Rack, deceased, and on behalf of the wrongful death beneficiaries of Lois M. Rack, pursuant to Arkansas Survival of Actions Statute (Ark. Code Ann. § 16-62-101) and the Arkansas Wrongful Death Act (Ark. Code Ann. § 16-62-102). As Special Administrator, Plaintiff requests for the Estate, compensatory damages for Ms. Rack's pain, suffering, and mental anguish; loss of life; and medical and funeral expenses. On behalf of Ms. Rack's wrongful death beneficiaries, plaintiff also requests damages for mental anguish caused by her death. The Plaintiff further requests Punitive Damages pursuant to Arkansas Code Annotated § 16-55-206.

### a.  DAMAGES

### i.  Compensatory Damages – Pain, Suffering, & Mental Anguish

Plaintiff introduced during the October 19, 2021, trial and the record is replete with evidence regarding the painful injuries that 52-year-old Ms. Rack endured leading up to her death. As numerous cases have noted, "[a] jury has much discretion in awarding damages in personal injury cases."[30] "[T]he amount of damages growing out of mental anguish is ordinarily left to the determination of the jury."[31] Any embarrassment and humiliation suffered by the victim are not separate elements of damage, but they can be considered as contributing to a plaintiff's mental anguish.[32] These types of damages are hard to quantify, and the Arkansas Supreme Court endorsed the following explication of their assessment in *Advocat, Inc. v. Sauer*, a nursing home case:

---

[30] Bill Davis Trucking, Inc. v. Prysock, 301 Ark. 387, 391, 784 S.W.2d 755, 757 (1990).
[31] *Pursley v. Price*, 283 Ark. 33, 35, 670 S.W.2d 448, 449-450 (1984).
[32] *Yam's Inc. v. !Yloore*, 319 Ark. 111, 116-117, 890 S. W.2d 246, 249 (1994).

> Pain and suffering have no market price. They are not capable of being exactly and accurately determined, and there is no fixed rule or standard whereby damages for them can be measured. Hence, the amount of damages to be awarded for them must be left to the judgment of the jury, subject only to correction by the courts for abuse and passionate exercise. One of the most difficult decisions facing the jury in a personal injury case is the size of the monetary award for pain and suffering, since there is no objective method of evaluating such damages. The question in any given case is not what sum of money would be sufficient to induce a person to undergo voluntarily the pain and suffering for which recovery is sought or what it would cost to hire someone to undergo such suffering, but what, under all the circumstances, should be allowed the plaintiff in addition to the other items of damage to which he or she is entitled, in reasonable consideration of the pain and suffering necessarily endured or to be endured. The amount allowed must be fair and reasonable, free from sentimental or fanciful standards, and based upon the facts disclosed.[33]

*Sauer* has several similarities to the current case. Like Ms. Sauer, Ms. Rack was frequently neglected and was found at times setting in her own urine.[34] Also, like Ms. Sauer, Ms. Rack was ignored and left alone by staff members because there was not enough staff available to provide her with assistance, which resulted in delayed or non-existent care.[35] In addition, much like Ms. Sauer, Ms. Rack developed pressure sores, was not given proper hygiene – including oral hygiene, and was left alone in her bed and chair for hours.[36]

Further, like Ms. Sauer, Ms. Rack's condition deteriorated to a point where the staff finally noticed that "she was not acting right," and she was finally sent to the hospital in critical condition and suffering from an infection where she subsequently passed away shortly thereafter.[37] Unlike

---

[33] 353 Ark. 29, 46-47, 111 S.W.3d 346, 355 (2003) (citing 2 Stein on Personal Injury Damages, § 8.8 (3d ed. 1997)).
[34] *Id*. at 43, 111 S.W.3d at 353.
[35] *Id*.
[36] *Id*. at 44, 111 S.W.3d at 353-354.
[37] *Id*. at 38—39, 111 S.W.3d at 350.

Ms. Sauer who suffered a urinary tract infection, Ms. Rack suffered from gangrene, a civil-war era infection, that ate the flesh off of her legs down to the bone.

The *Sauer* jury awarded $5 million for negligence and $10 million for medical malpractice and the court acknowledged that "virtually all of the damages awarded were for pain and suffering."[38] The court explained that "[n]o doubt the jury focused on Mrs. Sauer's age and medical condition at the time of her death, the extent of her misery, and the absence of care she received for the period leading up to her death ...."[39] In light of the testimony demonstrating Ms. Sauer's neglect, the Arkansas Supreme Court held that the "evidence in this case certainly reflects that Mrs. Sauer's estate was entitled to damages for pain and suffering in connection with both negligence and medical malpractice."[40] On appeal, these two pain and suffering awards were reduced to a total of $5 million.[41] There is, however, a noticeable difference. Unlike Ms. Sauer, who was a 93-year-old nursing home resident for five and a half years, Plaintiff in this case, a 52-year- old, spent approximately two months at the facility.

Except for *Sauer* and *Coulson*, there are few cases from Arkansas, or the Eighth Circuit, with facts similar to Ms. Rack's. Plaintiff directs the Court to a Texas state case from 2001 titled *The Estate of Ernst v. Horizon et al*., in which a disabled 53-year-old man passed away following development of a decubitus ulcer while at a nursing home.[42] The verdict reports the jury gave $7 million for pain and suffering.[43] A 2009 West Virginia case titled *The Estate of Douglas v. Manor*

---

[38] *Id.* at 48, 111 S.WJd at 356.

[39] *Id.*

[40] *Id.* at 45, 111 S.WJd at 354.

[41] 353 Ark. at 49, 111 S.W.3d at 357.

[42] **Exhibit 52** – Verdict from *Ernst, Estate of v. Horizon, et al*., JVR No. 467381 (Feb. 1, 2001).

[43] *Id.*

*Care Inc., et al.*, a jury awarded $6.5 million in pain and suffering for failure to maintain Douglas' hydration and nutritional status.[44] Plaintiff, who was 87-years-old, suffered injuries from dehydration which led to an irreversible change in her mental status, acute renal failure and death.[45] In *Coulson*, a 70-year-old resident who allegedly suffered asphyxiation from a clogged feeding tube and perished from the injuries associated therewith discussed more below. Coulson's estate was awarded $2,000,000 for pain, suffering, and mental anguish. Ms. Coulson and Ms. Rack were both residents of Hillview.  Based on the foregoing facts, including the duration of Ms. Rack's pain, suffering, and mental anguish, testimony and evidence in this case, and the jury verdicts in the above discussed cases, this Court finds pain and suffering damages in the amount of $3,500,000.

### ii.   Compensatory Damages – Loss-of-Life

Pursuant to Ark. Code Ann. § 16-62-101(b), a decedent's estate may recover for the decedent's loss of life as an independent element of damages, in addition to all other elements of damages provided by law. As the Arkansas Supreme Court has made clear, loss-of-life damages are not the same as pain-and-suffering damages and should be awarded separately. "Historically, damages recovered by a decedent's estate under the survival statute, with the exception of funeral expenses, compensated the decedent and were incurred pre--death."[46] Those damages included "medical expenses due to the injury, lost wages between injury and death, pain and suffering, etc."[47] "However, subsection (h) [of the Survival Statute] states that loss-of-life damages are 'in

---

[44] **Exhibit 53** - Douglas, Individually and on behalf of Douglas, Estate of v. Manor Care Inc., et al., JVR No. 1408190029 (Aug. 5, 2011).
[45] *Id.*
[46] *Durham v. Marbwy*, 356 Ark. 481, 486, 156 S.W.3d 242, 244 (2004).
[47] *Id.*

addition to all other elements of damages provided by law.'"[48] As the court concluded, "logically, they must be new, because the phrase 'all other elements of damages provided by law' would encompass every element of damages-including pain and suffering-that was already recoverable under both statutory and case law."[49] The court further clarified that "[l]oss-of-life damages seek to compensate a decedent for the loss of the value that the decedent would have placed on his or her own life."[50]

The issue then becomes what type of proof is appropriate and permitted to establish loss of life damages. "Even though direct evidence is not required, the personal representative must offer some proof that: 1) the decedent valued his life; 2) the jury has a basis to infer that value; and 3) the jury has a basis to award damages on that value."[51] Mere proof of life, and then death, is insufficient.[52]

Unlike the traditional nursing home case wherein the resident is typically much older, Ms. Rack was only 52-years-old when she entered the Facility. She planned to return home to be with her Family and take care of her mother. When considering the value Ms. Rack would have placed on her own life, it is important to note that she was a singer – who when she sang in church "everybody felt the Holy Ghost," a baby sister who brought joy to her Family, and her mother's caretaker. Ms. Rack is no longer alive to explain the value she placed on her life, but the testimony

---

[48] *Id.* at 487, 156 S.W.3d at 244-245.
[49] *Id.*
[50] *Id.* at 492, 156 S.W.3d at 248.
[51] § 34:3. Loss of life damages, 1 Arkansas Law Of Damages § 34:3.
[52] *Id.*

from her Family members about who she was as a person established Ms. Rack placed great value on her life.

In *Pope*, circumstantial evidence as to the decedent's role as a wage earner, and as a mother and grandmother, as well as her family activities, was substantial evidence from which the jury could infer the value she placed on her life and could award damages. In the same accident, two other women were killed; loss of life claims were submitted to the jury and the jury awarded each estate the sum of $1,001,585 for loss of life and funeral expenses.[53] In a recent Arkansas state case titled *The Estate of Doris Coulson v. Joseph Schwartz, et al.*, the Judge awarded $1 million in loss-of-life to Plaintiff.[54]

A federal court awarded $600,000 loss of life damages to an estate of a 17 month old child who died following surgery.[55] Unreported federal district court decisions have assigned a loss of life value of $400,000 to a 75 year old accident victim[56] and $80,000 to an elderly person.[57] Based on the foregoing facts, testimony and evidence in this case, and relevant case law, this Court finds loss-of-life damages in the amount of $1,000.000.

---

[53] *One Nat. Bank v. Pope*, 372 Ark. 208, 272 S.W.3d 98 (2008).
[54] Judgment from *The Estate of Doris Coulson v. Joseph Schwartz, et al.*, No. 60CV-19-473 (Pulaski Cty.), May 5, 2020.
[55] *McMullin v. U.S.*, 515 F. Supp. 2d 914 (E.D. Ark. 2007), as revised, (Oct. 22, 2007) (evidence suggested a 50 year life expectancy in the absence of malpractice).
[56] See *Bennett v. United States*, 4:04 CV0007, cited in *McMullin v. U.S.*, 515 F. Supp. 2d 914 (E.D. Ark. 2007), as revised, (Oct. 22, 2007).
[57] See *Citizen Bank of Batesville v. United States* 1:1 CV00104, cited in *McMullin v. U.S.*, 515 F. Supp. 2d 914 (E.D. Ark. 2007), as revised, (Oct. 22, 2007).

### iii.   Wrongful Death – Damages to Beneficiaries

Ms. Rack's surviving siblings qualify as wrongful death beneficiaries.[58] "The jury or the court, in cases tried without a jury, may fix such damages as will be fair and just compensation for pecuniary injuries, including a spouse's loss of the services and companionship of a deceased spouse and any mental anguish resulting from the death to the surviving spouse and beneficiaries of the deceased."[59] Although it has not always been so, mental anguish suffered by beneficiaries is recoverable under the statute and "include[s] grief normally associated with the loss of a loved one."[60] The Arkansas Supreme Court has also held that "[a]n award for mental anguish may cover not only the mental suffering prior to trial, but also the suffering which is reasonably probable to occur in the future."[61]

Although the factors listed below are no longer required to prove that a beneficiary suffered mental anguish beyond the normal grief associated with the loss of a loved one to recover under the wrongful-death statute, see Ark. Model Jury Instr.-Civil 2216, cmt. 1 (2020), the following factors have been significant for evaluating the relationship between the deceased and the surviving beneficiaries:

> (1)   The duration and intimacy of the relationship and the ties of affection between the decedent and survivor.

> (2)   Frequency of association and communication between an adult decedent and an adult survivor.

---

[58] A.C.A. § 16-62-102(d)(1).
[59] A.C.A. § 16-62-102(f)(1).
[60] A.C.A. § 16-62-102(f)(2).
[61] *Knoles v. Salazar*, 298 Ark. 281, 284-285, 766 S.W.2d 613,615 (1989) (concluding it was error to preclude evidence of the life expectancies of the beneficiaries to calculate future mental anguish).

(3)    The attitude of the decedent toward the survivor, and of the survivor toward the decedent.

(4)    The duration and intensity of the sorrow and grief.

(5)    Maturity or immaturity of survivor.

(6)    The violence and suddenness of the death.

(7)    Sleeplessness or troubled sleep over an extended period.

(8)    Obvious extreme or unusual nervous reaction to the death.

(9)    Crying spells over an extended period of time.

(10)    Adverse effect on survivor's work or school.

(11)    Change of personality of the survivor.

(12)    Loss of weight by survivor and other physical symptoms.

(13)    Age and life expectancy of the decedent.[62]

"The judge of the court in which the claim or cause of action for wrongful death is tried ... shall fix the share of each beneficiary, and distribution shall be made accordingly."[63]

The devastation the Family suffered from the loss of their sister cannot be fully explained in words. The Court heard and saw at the trial how Robert Rack and James Wesson were reduced to tears when they spoke about Ms. Rack. The Court also heard the testimony from Brinda Tillman and Roberta McGregor about the impact losing Ms. Rack had on them and the Family. The Family had hopes that Ms. Rack would recover and come home. Instead, the Family was left to watch for weeks as infection ate the flesh off their sister's legs, watch bedsores develop on her buttocks and watch the area around her tracheostomy get infected. The calls for help at the Facility fell on deaf ears. In the end, the

---

[62] *lvfartin v. Rieger*, 289 Ark. 292,296,711 S.W.2d 776,778 (1986).
[63] A.C.A. § 16-62-102.

Family was left with a choice to amputate Ms. Rack's gangrenous legs with a low chance of survival or continue with palliative care.

The Court also heard from the Family about how much Ms. Rack was loved. How Ms. Rack made all of them laugh and used to braid their hair. How the Family got together and played cards and dominoes. How Ms. Rack loved Roberta McGregor's cooking and even asked Ms. McGregor to send her a plate of soul food in the mail. Ms. Rack was not a typical nursing home resident nearing the end of her long-lived life, she was a 52-year-old who was supposed to go home and be with her Family. Ms. Rack's untimely death was undignified and excruciating. This process of deterioration took more than two neglectful months. The Family watched every step of the way as their sister developed and eventually succumbed to preventable injuries.

While admittedly no yardsticks exist by which to measure this immeasurable damage, the recovery must reflect the temperament, background, circumstances, and character of each survivor as judged by the common sense and experience of ordinary citizens.[64]

The Supreme Court has pointedly referred to its dislike of, and the difficulty of, judicial review of an award of damages for mental anguish.[65] Courts are reluctant to compare awards between cases because some matters are outside the trial court record, the

---

[64] *St. Louis Southwestern Ry. Co. v. Pennington,* 261 Ark. 650, 553 S.W.2d 436 (1977) (award of $2600 to each of five adult siblings of the adult decedent and $20,000 for mental anguish to the mother of the decedent); *Martin v. U.S.*, 448 F. Supp. 855, 881 (E.D. Ark. 1977), judgment aff'd in part, rev'd on other grounds in part, 586 F.2d 1206 (8th Cir. 1978) (no recovery for mental anguish for a child two years old at the time of his father's death, but $15,000 for the loss of parental guidance until the age of majority).
[65] *St. Louis Southwestern Ry. Co. v. Pennington*, 261 Ark. 650, 553 S.W.2d 436 (1977).

value of the dollar changes over years, the degree of mental anguish suffering is rarely the same, and the amount of mental anguish awards rests with the jury.[66] In light of the difficulty in reviewing the jury verdict, the appellate court affirms an award unless the recovery for mental anguish shocks its conscience or demonstrates passion for or prejudice against the defendant.[67]

In *Sauer*, the jury awarded each wrongful death beneficiary $100,000. Conversely, in an unpublished opinion, *Adams v. Haney*, Ruby Smothermon's four children were each awarded between $12,000 and $14,000 in a settlement agreement.[68]

Based on the foregoing facts, testimony and evidence in this case, and relevant case law, this Court awards $100,000 in wrongful death damages to each of the siblings: Robert Rack, James Wesson, Brinda Tillman and Roberta McGregor.

### iv.   Compensatory Damages – Medical and Funeral Expenses

Plaintiff introduced evidence of medical expenses incurred as a result of the negligent treatment. "[A] plaintiff who seeks to recover medical expenses must prove the expenses are reasonable and necessary."[69] "Necessary means causally related to the tortfeasor's negligence."[70] "If a plaintiff proves that her need to seek medical care was precipitated by the tortfeasor's

---

[66] *Wal-Mart Stores, Inc. v. Tucker*, 353 Ark. 730, 120 S.W.3d 61 (2003).
[67] *Moon Distributors, Inc. v. White*, 245 Ark. 627, 434 S.W.2d 56 (1968).
[68] *Adams v. Haney*, 2008 WL2444729 (2008).
[69] Ponder v. Cartmell, 301 Ark. 409, 412, 784 S.W.2d 758, 761 (1990).
[70] *Id.*

negligence, then the expenses for the care she receives, whether or not the care is medically necessary, are recoverable."[71]

Funeral expenses are recoverable by the estate through an action by the administrator.[72]

Plaintiff has pled that Joseph Schwartz's and Rosie Schwartz's violations caused actual damages including medical expenses.[73] Taking the allegations as admitted, Plaintiff is entitled to medical expenses. In addition, Exhibit 47 is a bill summary that shows the medical bills Ms. Rack received at the Facility, following discharge from the Facility and funeral expenses. This Court awards Plaintiff $110,975.06 in medical expenses and $6,817.80 in funeral expenses.

### v. **Punitive Damages**

A plaintiff is entitled to recover punitive damages when the defendant "knew or ought to have known, in light of the surrounding circumstances, that his or her actual conduct would naturally and probably result in injury or damages and that he or she continued the conduct with malice or in reckless disregard of the consequences from which malice may be inferred."[74]

Plaintiff in this case pled that the Defendants Joseph Schwartz and Rosie Schwartz purchased multiple Arkansas nursing home facilities, including the Facility in this case, in April of 2016. Defendants Joseph Schwartz and Rosie Schwartz purchased these Arkansas nursing homes aware of the ongoing quality of care and financial issues at Skyline and their operation of

---

[71] *Id.*
[72] *McCormick v. Sexton*, 239 Ark. 29, 35, 386 S.W.2cl 930, 934 (1965); see also Ark. Model Jury Instr. Civil 2216 (2020).
[73] *See* Pl.'s Amend. Compl., at p. 47, ¶¶ 186-193.
[74] *McCormick v. Sexton*, 239 Ark. 29, 35, 386 S.W.2cl 930, 934 (1965); see also Ark. Model Jury Instr. Civil 2216 (2020).

nursing homes across the country. Plaintiff also alleges the background on how Skyline became one of, if not the largest, nursing home chains in the country and the fall of Skyline.

Although liability has been established, it is important to consider Plaintiff's "SCHWARTZ DEFENDANTS' CONDUCT" allegations against Defendant Joseph Schwartz and Rosie Schwartz's for the purpose of determining punitive damages.[75] These allegations discuss the responsibilities Defendants Joseph and Rosie Schwartz owed Ms. Rack and how they both recklessly and intentionally maximized profits to the detriment of the Facility and ultimately Ms. Rack.

Moreover, the Defendants Joseph Schwartz and Rosie Schwartz's failures led to Ms. Rack's development of injuries including pressure sores, gangrene and sepsis.[76] Further, state and federal surveys put Defendants Joseph Schwartz and Rosie Schwartz on notice that this Facility was violating requirements for documenting, assessing and providing care for pressure ulcers, and not providing oral care – the same issues that arise in this case.[77] Unfortunately for Ms. Rack, Defendants Joseph Schwartz and Rosie Schwartz, with reckless disregard and conscious indifference, failed to take the steps to correct the ongoing problems at the Facility.

Various factors play into the assessment of punitive damages. First, "[punitive damages] constitute a penalty and must be sufficient not only to deter similar conduct on the part of the same tortfeasor but they must be sufficient to deter any others who might engage in similar conduct."[78] "There is no set standard for measuring punitive damages, and the calculation of those damages

---

[75] *Id.* at pgs. 21-28, ¶¶ 81-112.
[76] *Id.* at pgs. 28-31, ¶¶ 113-128.
[77] *Id.* at pgs. 31, ¶¶ 126-127.
[78] *Matthews v. Rodgers*, 279 Ark. 328,336,651 S.W.2d 453,458 (1983).

lies within the discretion of the jury after due consideration of all the attendant circumstances."[79] "The jury is free to consider the extent and the enormity of the wrong, the intent of the parties, and the financial and social standing of the parties."[80] "The conscious indifference of the alleged wrongdoer to the wrong committed is [also] a pertinent factor in assessing punitive damages."[81]

In *Sauer*, the Arkansas Supreme Court found it significant that there was evidence showing that the facility knew that it was short-staffed but did not take any steps to rectify the problem.[82]

Lastly, "[e]vidence of the defendant's financial wealth is a proper element to be considered in the computation of punitive damages."[83] In *Sauer*, the Arkansas Supreme Court accepted a $21 million punitive damage award (reduced from the jury's $63 million award) based in part on the fact that the collective defendants operated a rather substantial nursing home enterprise.[84] As the court pointed out:

> Ms. Hamlett testified that according to an Advocat news release, Advocat operated 86 facilities with 64 nursing homes with 7,300 beds in the southeast and Canada. Advocat was also listed on the New York Stock Exchange in 1996, 1997, and 1998, according to Ms. Hamlett. From this testimony, it appears that Advocat oversaw a major business enterprise.[85]

The Defendants here, like the ones in *Sauer*, operated a vast business enterprise and Defendant Joseph Schwartz bragged about being the largest nursing home chain in the country.[86] In fact, Skyline has been in national news for its unprecedented quick growth and disappearance

---

[79] *Smith v. Hansen,* 323 Ark. 188, 199-200, 914 S.W.2d 285, 291 (1996).
[80] *Id.*
[81] *Sauer*, 353 Ark. at 50-51, 111 S.W.3d at 358.
[82] *Id.*
[83] *Matthews v. Rodgers*, 279 Ark. at 336, 651 S.W.2d at 458.
[84] *Sauer*, 353 Ark. at 50-51, 111 S.W.3d at 363.
[85] *Sauer*, 353 Ark. at 52, 111 S.W.3d at 359.
[86] **Exhibit 38** – Dep. of Brandon Augustyniak from *Ottimis Lloyd, et al. v. Skyline Health Care LLC, et al.*, No. 60CV-18-6386 (Pulaski Cty.), 38:2-13.

from business leaving families like Ms. Rack's devastated.[87] Said article explains how Defendant Joseph Schwartz, grew his nursing home chain to over 100 facilities nationwide with all the money being funneled to him operating above a pizza parlor in New Jersey. The article explains how Mr. Schwartz somehow went through millions from his facilities while families like the Rack family and others quoted from Arkansas suffered.

The July 17, 2017 survey at the Facility put Defendants Joseph Schwartz and Rosie Schwartz on notice of issues at the Facility prior to Ms. Rack's admission.[88] This survey proves that despite Defendants' knowledge of the issues at the Facility – especially with bedsores, they continued participation in reckless business practices. Indeed, the Facility was cited for failure to ensure pressure ulcer treatments were provided and failed to ensure proper documentation and assessment was completed for pressure sores similar to the injuries suffered by Ms. Rack.[89]

Said survey outlines the numerous deficiencies in the standard of care that resulted in Ms. Rack's death and further highlights the punitive nature of this case.[90] The Defendants were aware of serious deficiencies in care and put on notice by the survey; however, they neglected to fix the problem and continued to have horrific results due to their failure including Ms. Rack's untimely death.

On February 9, 2018, three days before Ms. Rack lost her life, another survey took place at the Facility. The findings of the twenty-three-page survey show the Facility failed on all fronts.

---

[87] **Exhibit 28** – "A nursing home chain grows too fast and collapses, and elderly and disabled residents pay the price."
[88] *See generally* Exhibit 15 – July 17, 2017 survey at the Facility.
[89] *Id.*
[90] *Id.*

These citations include failures that occurred during the time Ms. Rack was a resident. Notably, this survey also shows six residents developed contractures and three residents developed pressure ulcers greater than Stage 1 at the Facility.[91]

On March 21, 2018, an additional survey was done at the Facility.[92] This sixty- three-page survey showed, amongst other things, violations of management funds, misappropriation and exploitation of residents dealing with credit card fraud, and failure to immediately report violations involving abuse, neglect exploitation or mistreatment.[93]

In light of the allegations in Plaintiff's Amended Complaint which are deemed admitted, the evidence in the record, the testimony from the Family and Dr. Dupee, this Court believes that Plaintiff is entitled to punitive damages. While Ms. Rack screamed out in pain as the gangrene ate away the flesh from her legs, while she suffered in agony from the open bed sore wounds on her buttocks, while the Family watched their sister wither and were faced with a choice to amputate her legs or palliative care, Defendants Joseph Schwartz and Rosie Schwartz siphoned millions into their pockets. In *BMW of North America, Inc. v. Gore*, the United States Supreme Court created a three-part test to determine whether punitive damages are appropriate and not excessive.[94] The test considers three factors:

(1)     the degree of reprehensibility of the defendant's conduct;

(2)     the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award; and

---

[91] *See* **Exhibit 16** – February 9, 2018 survey at the Facility.
[92] *See* **Exhibit 17** – March 21, 2018 survey at the Facility.
[93] *Id.*
[94] *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

     (3)     the difference between this remedy and the civil penalties authorized by statute or imposed in comparable cases.[95]

## A.    Reprehensibility

The Arkansas Supreme Court in *Union Pacific R.R. Co. v. Barber* considered the reprehensibility factor after the jury awarded $21 million in punitive damages.[96] Plaintiffs in *Barber* drove a garbage truck that was hit on a railroad track owned by defendant.[97] Defendant, like in this case, valued monetary gain over the personal safety of those crossing the railroad tracks.[98] In addition, defendant engaged in misconduct during litigation by destroying evidence and ignored a dangerous condition in the face of complaints.[99] Specifically, defendant in *Barber* received complaints of "near misses."[100] The *Barber* court held defendant's conduct "was indicative of a high degree of reprehensibility."[101]

As discussed above, the reprehensibility in this case is similar to *Barber*. There is a wrongful death in this case. Defendants Joseph Schwartz and Rosie Schwartz valued monetary gain over the personal safety of residents – not just Ms. Rack but residents across the country. Defendants Joseph Schwartz and Rosie Schwartz were made aware of the ongoing issues at the Facility but failed take any corrective actions. In addition, Defendants Joseph Schwartz and Rosie

---

[95] *Id.*
[96] *Union Pac. R.R. Co. v. Barber*, 356 Ark. 268, 303, 149 S.W.3d 325, 348 (2004).
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.*

Schwartz chose not to participate in litigation. The Court finds that the reprehensibility factor has been met.

### B.     Disparity

The *Gore* Court considered disparity by comparing the ratio of damages given for actual harm and those awarded by punitive damages.[102] Further, evidence showing threat to others from a defendant's conduct is a consideration in the disparity factor.[103] In *Gore*, there was no evidence that others were threatened by BMW's non-disclosure policy. Here, Plaintiff has alleged and the evidence in the record proves Defendants Joseph Schwartz's and Rosie Schwartz's practices threatened, injured and ultimately cost Ms. Rack her life. Accordingly, the disparity factor has been satisfied.

In addition, the ratio of punitive damages to compensatory damages is an important consideration when analyzing the adequacy of punitive damages.[104] The *Sauer* court held that the ratio of punitive damages to compensatory damages should be single digit multipliers to comport with due process.[105] This Court's punitive damage award, as seen below, is well within the single digit ratio established by precedent.

---

[102] *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582, 116 S. Ct. 1589, 1602, 134 L. Ed. 2d 809 (1996).
[103] *Id.*
[104] *Id.*
[105] *Advocat, Inc. v. Sauer*, 353 Ark. 29, 56, 111 S.W.3d 346, 361 (2003) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S., 123 S.Ct. 1513).

## C.      Comparable Cases

The Arkansas Supreme Court in *Sauer* looked at the third factor of the civil penalties in comparable nursing homes and held that,

> Appellants claim that it ludicrous to conclude that Mrs. Sauer suffered 6,300 violations under the subchapter to substantiate a punitive-damages award of $63 million. However, it appears from the definition of the term 'neglect' that it is impossible to know how many violations might have occurred; nor have the appellants suggested a more appropriate number. Moreover, the jury verdicts from other jurisdictions cited in the circuit court's letter opinion do not inform this court about whether those cases were ultimately settled or appealed and affirmed.[106]

From there, the *Sauer* court looked at comparable cases to determine whether the punitive damages award "shocked the conscious."[107] The court in *Sauer* also took into account the highest punitive damages award that was affirmed by the Arkansas Supreme Court and Arkansas Appellate Courts at the time of the verdict – which was respectively $3 million and $4 million – to determine whether the $61 million in punitive damages shocked the conscious.[108] Even with the $3 million and $4 million as a references, the Sauer court awarded $21 million in punitive damages.

In *Coulson*, the Judge awarded $15 million in punitive damages against Defendant Joseph Schwartz and his entities for a wrongful death that took place at the Facility.[109] Notably, the events in *Coulson* took place prior to Ms. Rack's residency. As such, Defendant Joseph Schwartz and Rosie Schwartz's reckless disregard for the residents at the Facility continued past the untimely

---

[106] *Advocat, Inc. v. Sauer,* 353 Ark. 29, 57, 111 S.W.3d 346, 362 (2003).
[107] *Id.*
[108] *Id.*
[109] **Exhibit 54** – Judgment from *The Estate of Doris Coulson v. Joseph Schwartz, et al.*, No. 60CV-19-473 (Pulaski Cty.), May 5, 2020.

death of the 70-year-old resident in Coulson – who allegedly suffered asphyxiation from a clogged feeding tube and perished from the injuries associated therewith.

The Arkansas Supreme Court in *Southern Farm Bureau Cas. Ins. Co.* analyzed how different states across the nation view punitive damages.[110] The *Southern Farm* court held, "the purpose of punitive damages in both Florida and Virginia was for the protection of the public, punishment of the offender and warning and deterrent to others. These purposes are identical to the stated purposes in Arkansas."[111] This Court's award of $5,000,000 in punitive damages is sufficient to protect the public, punish these Defendants for placing profits over people, and deter actors like Joseph Schwartz and Rosie Schwartz from taking advantage of the most vulnerable members of the population. This amount reflects an amount that is in line with the purpose of punitive damages, and is well within the limits of due process.

In Conclusion, IT IS THEREFORE RECOMMENDED that the Plaintiff be awarded the following damages:

1) **Compensatory Damages – Pain, Suffering & Mental Anguish**: $3,500,000.00

2) **Compensatory Damages – Loss of Life:** $1,000,000.00

3) **Wrongful Death – Damages to Beneficiaries:**

   a. **Robert Rack:** $100,000.00

   b. **James Wesson:** $100,000.00

   c. **Roberta McGregor:** $100,000.00

   d. **Brinda Tillman:** $100,000.00

4) **Compensatory Damages – Medical Expenses:** $110,975.06

5) **Compensatory Damages – Funeral Expenses:** $6,817.80

6) **Punitive Damages:** $5,000,000

---

[110] *S. Farm Bureau Cas. Ins. Co. v. Daniel*, 246 Ark. 849, 859, 440 S.W.2d 582, 587 (1969).
[111] *Id.*

28

**Total**: $10,017,792.86.

     **SO ORDERED THIS** 27th day of December, 2021.

                                     _____

                                           **JEROME T. KEARNEY**
                               **UNITED STATES MAGISTRATE JUDGE**